**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID SHULICK** and | : | |
| **CHERIE SHULICK,** | : | **CIVIL ACTION** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **UNITED AIRLINES** and | : | |
| **US AIRWAYS,** | : | **NO. 11-1350** |
| Defendants. | : | |

**M E M O R A N D U M**

**GENE E.K. PRATTER, J.**                                                                  **FEBRUARY 2, 2012**

**I.      INTRODUCTION**

Bad news may travel fast but it is hardly news that bad weather often stops travel altogether. For David and Cherie Shulick, however, the worst blizzard of the year was no excuse for impeding their family's slopes and seas vacations at the close of 2010.

David Shulick, a lawyer representing himself and his wife, Cherie, brings the instant action against United Airlines and U.S. Airways, for alleged violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. C. S. §§ 201-1 et seq. (the "UTPCPL"), negligent misrepresentation, negligent infliction of emotional distress, and violations of Title II of the Civil Rights Act. These claims arise out of these airlines' cancellation of several of the Shulicks' flights due to blizzard conditions, and the various problems then experienced and costs incurred by the Shulicks associated with their efforts to

rearrange their travel plans. Now before the Court are the airlines' separate motions to dismiss, which the Shulicks oppose, of course. For the reasons that follow, the Court grants the motions.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Due to severe blizzard conditions in December of 2010, the Shulicks, along with their two children, experienced considerable difficulty returning to Philadelphia, Pennsylvania from the first half of their winter holiday in Aspen, Colorado, in time to fly to the second half of their vacation, a cruise that departed from Orlando, Florida.

The Shulicks purchased round-trip tickets from United for a flight leaving Philadelphia for Aspen, on December 21, 2010, with a return flight on December 26, 2010. They also purchased tickets from USAir for a flight from Philadelphia to Orlando on December 29, 2010, returning January 3, 2011. On December 25, 2010, while the Shulicks were in Aspen, United canceled the Shulicks' return flight from Aspen for the next day due to extreme weather conditions in the eastern part of the country, including in and around Philadelphia. For several hours after receiving notice of the cancellation, the Shulicks allege they were unable to reach United's customer service representatives by telephone or internet to re-book a flight to Philadelphia. They then elected a different course. Because their hotel in Aspen was fully booked after December 26th, the Shulicks decided to rent a car. They then drove from Aspen to the airport in Denver, Colorado. Their idea was to speak in person with airline ticketing agents, with a view toward trying to find a flight to Philadelphia that had not been canceled by the weather emergency.

The Shulicks allege that following their drive they were unable to get in-person help at the airport and were directed instead to contact the websites and toll-free telephone numbers of

the defendant airlines, which they allege were not working or at least not responsive to their needs. Consequently, the Shulicks rented a hotel room at the Four Seasons Hotel in Denver on December 26th, and continued to try to book a return flight via the internet. Unfortunately, United's website "crashed" due to the volume of customers attempting to access the airline's re-booking services, and it remained non-functional for perhaps as long as 36 hours. Eventually, as the weather emergency in the eastern United States seemed to abate, the Shulicks booked a flight via the internet for December 28, 2010. However, because that December 28th flight would arrive in Philadelphia after midnight, i.e., in the early hours of December 29th, and their flight to Orlando would depart that same morning of December 29th, leaving the Shulicks little time to sleep or pack for their warm weather holiday cruise, they continued to try to book an earlier flight.

After reaching a United agent to speak with directly by phone around 1:00 a.m. on December 26th, the Shulicks were re-booked from Denver to Philadelphia, with a connection in New Orleans, Louisiana. At the time of re-booking, a United agent told the Shulicks that their connecting flight was confirmed and that the Philadelphia Airport was then operating, despite severe weather conditions. The Shulicks traveled to New Orleans on the first leg of the trip. By the time they reached New Orleans, the connecting flight to Philadelphia had been cancelled.

At the New Orleans airport, the Shulicks were at first unable to retrieve their checked baggage, in which they had packed their children's medication. The Shulicks allege that in New Orleans, the United baggage agent, an African-American woman, from whom the Shulicks (who are Caucasian) sought baggage retrieval assistance, behaved in a discriminatory fashion toward Cherie Shulick, calling her a "honkey," laughing at her and harassing the family, and refusing to

help locate their baggage. During this contretemps, the United baggage agent called a New Orleans Police officer to support her in confronting Cherie Shulick. While this was occurring, David Shulick was videotaping his wife's encounter with the baggage agent (Mr. Shulick later sent the videotape to United's corporate headquarters, demanding that the New Orleans baggage employee be terminated or, at least, formally reprimanded).[1] Ultimately, a porter at the New Orleans airport helped the Shulicks retrieve their checked baggage. The Shulicks then rented a car at the airport, drove into the city, and stayed overnight at a hotel.

In light of the continuing blizzard conditions in the Northeast, the Shulicks determined that, in order to get to Florida in time to embark on their cruise, they would need to fly directly from New Orleans to Orlando. The Shulicks were unable to book a flight from New Orleans to Orlando through either United or USAir, so Mr. Shulick booked a flight on Southwest Airlines and rented a hotel room at the Ritz Carlton Hotel in Orlando for the remaining night prior to the departure of the cruise.

Smooth sailing was short lived. While the Shulicks were aboard the cruise, defendant USAir cancelled the January 3, 2011 return flight from Orlando to Philadelphia. The Shulicks again spent time on telephone "hold" with USAir agents while re-booking the flight. They were unable to sit with their children on the re-booked return flight to Philadelphia.

Some three weeks after returning from the cruise, and apparently giving vent to the recognizable frustrations unfortunately and seemingly inevitably experienced by travelers everywhere, the Shulicks commenced this action in the Philadelphia Court of Common Pleas on

---

[1] The Shulicks further allege that they were told by a Transportation Security Administration employee and a USAir employee in the New Orleans airport that the United baggage agent in question had a history of discriminatory conduct towards Caucasian customers.

January 28, 2011. The airlines removed the action to this Court on February 25, 2011 and immediately filed a joint motion to dismiss. The Shulicks then filed an Amended Complaint, which the airlines again jointly moved to dismiss. A Second Amended Complaint was filed on April 20, 2011.

The Second Amended Complaint sets forth the following counts: violations of the UTPCPL (Count I); negligent misrepresentation (Count II); negligent infliction of emotional distress (Count III); and violations of Title II of the Civil Rights Act (Count IV). Counts I-III are against both United and USAir; Count IV is against United only.

The Shulicks claim that, as a result of United's conduct, they sustained $13,393.39 in damages stemming from the costs of the original flights, the re-booked flights, the Southwest Airlines flight booked by Mr. Shulick, rental car fees, and Four Seasons, Ritz Carlton, and other hotel room charges. They claim that, as a result of USAir's conduct, they sustained $4,125.20 for costs related to that airline's cancellation of the January 3rd return flight from Orlando and failure to refund their December 29th outbound flight from Philadelphia. The Shulicks also claim that they suffered severe emotional distress as a result of what the Shulicks describe as both airlines' negligent and outrageous conduct, for which they demand damages in the amount of $52,555.17 (their costs of $17,518.39, trebled), attorney's fees, punitive damages[2] related to Counts I-III, and an injunction requiring United to terminate its New Orleans airport baggage agent.

United and USAir each filed a motion to dismiss the Second Amended Complaint, and their motions are now before the Court.

---

[2] The Shulicks' claim for punitive damages against Defendant USAir was withdrawn on the record at the oral argument before the Court on the motions to dismiss.

### III. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (quoting Conley, 355 U.S. at 47), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citations omitted). The question is, briefly stated, has the claimant presented a "plausible" claim for relief? Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 1965 (citations omitted). The question is not whether the claimant will ultimately prevail but whether the complaint is "sufficient to cross the federal court's threshold." Skinner v. Switzer, 131 S. Ct. 1289, 1296 (2011) (citations omitted); see also Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1323 (2011). Nonetheless, to survive a motion to dismiss, a civil complaint must allege "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (confirming that Twombly applies to all civil cases).

The Court "must only consider those facts alleged in the complaint and accept all of those allegations as true." ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); see also Twombly, 127 S. Ct. at 1965 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)").

Although the Court must accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party, Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989), the Court need not accept as true "unsupported conclusions and unwarranted inferences," Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000) (citing City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998)), or the plaintiff's "bald assertions" or "legal conclusions." Morse v. Lower Merion Sch. Dist., 132 F.3d. 902, 906 (3d Cir. 1997).

## IV. DISCUSSION

### A. Counts I and II[3]

The Airline Deregulation Act of 1978 (the "Deregulation Act") reflects Congress's determination that "maximum reliance on competitive forces would best further efficiency, innovation, and low prices as well as variety and quality of air transportation services." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378 (1992) (internal quotations omitted). To "ensure that the States would not undo federal deregulation with regulation of their own," id., the Deregulation Act included a provision expressly preempting state enactment or enforcement of any "law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier. . . ." 49 U.S.C. § 41713(b)(1).

The scope of the preemption provision has been the subject of much debate in the federal courts. See, e.g., Northwest Airlines, Inc. v. Duncan, 531 U.S. 1058 (2000) (O'Connor, J., dissenting to denial of *certiorari*) (describing the conflict among the circuits regarding the

---

[3] Because the Court finds that Plaintiffs' claims are preempted by the Deregulation Act, the Court need not address at this time Defendants' arguments that the claims are barred under Pennsylvania's "gist of the action" doctrine.

definition of "service" within the preemption provision of the Deregulation Act). On the whole, the Supreme Court has held that the provision should be interpreted fairly broadly, such that most state enforcement actions, and many private actions, having a "connection with or reference to airline 'rates, routes, or services'" are preempted under the Deregulation Act. Morales, 504 U.S. at 384 (holding that National Association of Attorneys General guidelines governing airline fare advertising that were enforceable through the States' general consumer protection statutes were preempted); see also Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 370-71 (2008) (holding that, pursuant to the Court's reasoning in Morales, provisions of Maine's Tobacco Delivery law were preempted by the Federal Aviation Administration Authorization Act of 1994).

For example, in American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), members of a frequent flyer program brought suit against an airline claiming that certain retroactive modifications to the program devalued mileage credits already earned by the plaintiffs. These modifications, plaintiffs maintained, violated Illinois's Consumer Fraud and Deceptive Practices Act and constituted breach of contract. Id. at 225. The Supreme Court concluded that the Consumer Fraud Act was "paradigmatic" of the kind of legislation underpinning the guidelines at issue in Morales, which had "highlight[ed] the potential for intrusive regulation of airline business practices inherent in state consumer protection legislation . . . ." Id. at 227-28.[4]

The Shulicks elected to bring their claims under sections of the UPTCPL which prohibit, inter alia, misrepresenting the standard or quality of goods or services; failing to comply with the terms of a written guarantee given to a buyer at, prior to, or after making a contract for the

---

[4] On the other hand, the Court also determined that the Deregulation Act was *not* intended to preempt contract claims, which "seek[] recovery solely for the airline's alleged breach of its own, self-imposed undertakings." Wolens, 513 U.S. at 228.

purchase of goods or services; and engaging in fraudulent or deceptive conduct which creates likelihood of confusion or misunderstanding. See 73 Pa. C. S. §§ 201-2(vii), (xiv) and (xxi). Similarly, the Illinois Consumer Fraud Act preempted in Wolens, prohibited unfair methods of competition and unfair or deceptive acts or practices, "including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or concealment, [or] suppression or omission of any material fact . . . ." Wolens, 513 U.S. at 227 (quoting Ill. Comp. Stat., ch. 815, § 505/2 (1992)).

Here, the defendant airlines argue that the Shulicks' claims fall within the broad preemption of the Deregulation Act because the alleged violations of the UTPCPL and negligent misrepresentation arise from changes in flight schedules, subsequent notification of changes, re-booking, and refund policies, which clearly relate to the airlines' routes, rates and services. The Shulicks maintain that their claims have little to do with services provided by the airlines after ticket purchase, and instead arise from fraud and negligent misrepresentation in the formation of their contracts with the airlines. Specifically, the Shulicks suggest that the airline made "misleading deceptive, and or confusing representations about their services" in order to engage and solicit the Shulicks' business, but subsequently failed to provide the contracted-for services. Second Amended Compl. ¶¶ 26-29.[5]

The District Court in New Jersey addressed similar facts (i.e., an airline's alleged failure to provide contracted-for services) and arguments in Flaster/Greenberg, P.C. v. Brendan Airways, LLC, No. 08-4333, 2009 WL 1652156 (D.N.J. June 10, 2009). There, the plaintiff

---

[5] That the Shulicks' Second Amended Complaint describes the purported misrepresentations as relating to the airlines' "services" certainly does not help their argument in opposition to preemption.

9

argued that its claim under the New Jersey Consumer Fraud Act was "not substantively related to the Defendant's cancellation of the agreed to route, but is aimed at the practice of entering into contracts without the intention to perform." Id. at *5. The Court concluded that, even read liberally, the claim had "the forbidden effect of impacting the airline's ability to determine and set rates, routes and services and, as in Wolens, involves policing of marketing practices." Id. at *6 (citation omitted).

The Shulicks attempt to distinguish Wolens by arguing that a frequent-flyer program is an "economic" issue affecting rates, wholly different from the issues underlying their own claims—"fraudulent, deceptive and intentionally misleading advertisements that deal not with a person's 'ability to fly for free' but with their well-being and safety." Pls.' Opp'n to United's Mot. to Dismiss at 7. The Court does not find this distinction convincing. The Shulicks' claims clearly rest on allegations that the airlines fraudulently or negligently misrepresented their ability and intention to provide services that have a direct impact on flight schedules, routes, and ticket prices. Consequently, "[p]ermitting this claim to move forward as plead would impermissibly sanction regulation of the manner in which the airline[s] advertise[] [their] services, interfere with the provision of services to [their] passengers, and would constrain the airline[s'] ability to cancel flights and/or routes[,] all of which offends the stated purpose of the [Deregulation Act] and is proscribed by the Act's preemption clause." Flaster/Greenberg, 2009 WL 1652156, at *6.

Accordingly, Counts I and II of the Shulicks' claim are preempted.

B. **Count III**

Under Pennsylvania law, claims of negligent infliction of emotional distress are limited to four factual scenarios, including where (1) the defendant had a special contractual or fiduciary relationship with the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a "zone of danger" of a physical impact, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious physical injury to a close relative. Toney v. Chester Cty. Hosp., Nos. 60 MAP 2009, 61 MAP 2009, 2011 WL 6413948, at *11 (Pa. Dec. 22, 2011); Wardlaw v. City of Philadelphia Street's Dep't, 378 F. App'x 222, 225 (3d Cir. 2010).

The Shulicks allege that their underlying distress was caused by "the fraudulent representations, the complete and utter negligence of United's staff and the racially discriminatory comments hurled at Plaintiffs by a United worker," as well as general insensitivity toward the Shulicks on account of their race. Pl. Opp'n to United Mot. to Dismiss at 18. The Shulicks did not plead any facts establishing that there was a physical impact or risk of physical impact to themselves or a close relative. Therefore, the Court will analyze the Shulicks' negligent infliction of emotional distress claim under the "special relationship" rubric because it is the only such claim that does not require physical impact. Toney, 2011 WL 6413948 at *11. To prove "special relationship" negligent infliction of emotional distress, the plaintiff must demonstrate that a special contractual or fiduciary relationship exists between the parties creating "an implied duty [on the part of the defendants] to care for the plaintiff[s'] emotional well-

being," and the plaintiffs suffered "extreme emotional distress" as a result of the defendants' breach of that duty. Id. at *11-16.

As the Pennsylvania Supreme Court made clear in Toney, not all contractual or fiduciary relationships qualify as "special relationships" for the purposes of a claim of negligent infliction of emotional distress. Id. at *10-11.  Rather, the only preexisting relationships sufficient to establish a duty to care for the plaintiff's emotional well-being are those "involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach" such as the doctor-patient relationship, the relationship between a funeral director and a widow or widower, and other situations involving "life and death." Id. at *9, 11.  The contractual relationship between an airline and its passengers certainly would not qualify as the type of emotionally-charged special relationship described in Toney, either in the context of the insensitive baggage handler or the failures of the airlines to effectively assist the Shulicks with re-arranging their travel plans in the face of the inclement weather challenges.

Accordingly, the plaintiffs fail to state a cognizable claim for negligent infliction of emotional distress.[6]

---

[6] Although the Defendants did not move to dismiss Count III on preemption grounds, the Court observes that – in addition to the grounds for dismissal embraced in this ruling – a compelling argument can be made that Count III is also preempted by the Deregulation Act. In the absence of a definitive Supreme Court ruling on the scope of the word "services," the various circuit courts of appeals have taken different approaches in defining the term. Compare Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1261 (9th Cir. 1998) (construing "service" narrowly to hold it does not include "the provision of in-flight beverages, personal assistance to passengers, the handling of luggage, [or] similar amenities"), with Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336 (5th Cir. 1995) (construing "service" broadly to hold it includes "contractual features of air transportation, including 'ticketing, boarding procedures, provision of food and drink, and baggage handling."); Air Transp. Ass'n of Am. v. Cuomo, 520 F.3d 218 (2d Cir. 2008) (noting that the First, Fourth, Fifth, Seventh, and Eleventh Circuits have adopted the broader definition of "service"). In her dissent to the denial of *certiorari* in Northwest Airlines, 531 U.S. at 1058, Justice O'Connor suggested that the Third Circuit Court of Appeals expressly adopted the Ninth Circuit's minority view of the term "services" in Taj Mahal, 164 F.3d 186. Upon further analysis, however, it actually appears that the Third Circuit Court of Appeals did not "expressly" adopt the Ninth Circuit's approach. Although the Third Circuit Court of Appeals suggested that the Ninth Circuit's reasoning in Charas "offers a more promising solution," as Third Circuit

C. **Count IV**

Title II of the Civil Rights Act provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

42 U.S.C. § 2000a-3 governs civil actions for injunctive relief under Title II and requires that:

> (c) In the case of an alleged act or practice prohibited by this subchapter *which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act* or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) of this section before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings. (emphasis added).

Courts have held that this section is a "mandatory jurisdictional prerequisite" to a civil suit, and a Title II plaintiff must demonstrate that he or she has satisfied the notice requirement before a federal court has subject matter jurisdiction to hear the plaintiff's claim. See Hollis v. Rosa Mexicano, LLC, 582 F. Supp. 2d 22, 24-25 (D.D.C. 2008); Bilello v. Kum & Go, LLC, 374

---

Court of Appeals Judge Greenaway noted during his tenure as a trial judge, in Panitch v. Continental Airlines, No. 06-3611, 2008 WL 906240, at *5 (D.N.J. Mar. 31, 2008), the Third Circuit Court of Appeals only adopted the Ninth Circuit's reasoning, "insofar as it limits the extension of the preemption provision to all state common law causes of action, and in particular to personal injury claims." It did not, however, expressly adopt the Ninth Circuit's narrow definition of "service." Applying the sound reasoning of the majority of circuit courts of appeals, it becomes clear that both the difficulties the Shulicks experienced with re-scheduling their travel plans and their unfortunate interactions with the United baggage handler fall within the broad definition of "services" adopted by that majority of circuit courts of appeals. Accordingly, the Shulicks' claims of negligent infliction of emotional distress could well be seen as similarly preempted by the Deregulation Act.

F.3d 656, 659 (8th Cir. 2004); see also Stearns v. Baur's Opera House, Inc., 3 F.3d 1142, 1144-45 (7th Cir. 1993); Bradley v. Family Dollar, Inc., Nos. 10-2299, 10-2300, 2010 WL 5559519, at *8-9 (M.D. Pa. Nov. 18, 2010); Barton v. Thompson, No. 95-2154, 1995 WL 860632, at *2 (D. Md. Nov. 28, 1995).

It is undisputed that the discriminatory acts alleged here took place in New Orleans, Louisiana. Louisiana has an applicable statute addressing discrimination in places of public accommodation, La. Rev. Stat. § 51:2247, which empowers the Louisiana Commission on Human Rights to investigate complaints alleging violations of discrimination. La. Rev. Stat. § 51:2235. However, the Shulicks did not file notice of their complaint with the Louisiana Commission on Human Rights. Instead, on February 8, 2011, the Shulicks filed a complaint with the Pennsylvania office of the Equal Employment Opportunity Commission ("EEOC"). The airline defendants were made aware of this filing and were provided with copies of that complaint. Nonetheless, 42 U.S.C. § 2000a-3 is unambiguous: notice must be filed with the state or the local agency of the state within which the discrimination occurred.[7] The alleged discrimination took place in Louisiana, and the Shulicks failed to file written notice with the Louisiana Commission before filing suit in the Philadelphia Court of Common Pleas.

Accordingly, this Court lacks subject matter jurisdiction as to Count IV and that claim must be dismissed.[8]

---

[7] Even had the alleged discriminatory acts occurred in Pennsylvania, the Shulicks would have been required to file notice with the Pennsylvania Human Relations Commission under 43 Pa. C. S. §§ 953, 956, not with the EEOC.

[8] Although United should perhaps more properly have moved to dismiss Count IV under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction instead of Rule 12(b)(6) for failure to state a claim, see Hollis, 582 F. Supp. at 24-25, the Court is obliged to dismiss the action if at any time it determines, as it has here, that it lacks subject-matter jurisdiction. FED. R. CIV. P. 12(h)(3).

## V.     CONCLUSION

For the reasons stated and discussed in detail above, the Motions to Dismiss filed by Defendants United and USAir will be granted.

An appropriate Order follows.

BY THE COURT


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE
